Daniel Srourian, Esq. (SBN 285678)
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Dr., Suite 200
Beverly Hills, CA 90210
Telephone: (213) 474-3800
Fax: (213) 471-4160
Email: daniel@slfla.com

Mark S. Reich*
Christopher V. DeVivo*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: mpollack@zlk.com

*pro hac vice* forthcoming

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| QUANOVATE TECH INC. d/b/a MIRA | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

**NATURE OF THE ACTION**

1.      Courts have recognized that undisclosed and opaque digital tracking practices threaten consumer privacy. The unauthorized collection of individuals' browsing activity, website interactions, and device identifiers infringes upon a reasonable expectation of privacy in online activity. Companies often represent that users may control the sale, sharing, or tracking of their data. When personal information continues to be transmitted after those representations, the conduct is improper.

2.      Quanovate Tech Inc. d/b/a Mira ("Mira" or "Defendant") owns and operates the website located at https://miracare.com, including its online store at https://shop.miracare.com (the "Website"). Through the Website, Defendant markets and sells hormone monitors, fertility tests, prenatal supplements, menopause testing kits, and related health products, and encourages users to engage with sensitive content concerning hormone health, fertility, and reproductive planning. The Website presents users with a cookie banner and a cookie-preferences interface purporting to provide users with meaningful control over the collection, use, sale, or sharing of their personal information.

3.      These assurances of Defendant are false. Cookie-consent interfaces are deceptive and legally actionable where a website places and transmits tracking technologies before users have an opportunity to interact with the cookie banner, and continues transmitting user data even after users affirmatively reject all non-essential cookies and opt out of the sale or sharing of personal information. The Website begins placing and transmitting cookies, pixels, and other tracking technologies immediately upon a user landing on any page, before the user can review or act upon the cookie banner. Even after users toggle off the sale or sharing of personal information and decline all non-necessary cookies, the Website continues to deploy and transmit user data through third-party tracking tools (the "Tracking Tools") to advertising and social media companies, including TikTok, Meta (Facebook), X (Twitter), and Pinterest (the "Tracking Entities").

4.      This tracking captures detailed interaction and behavioral data, including links, buttons, forms, and other on-page elements selected by users, as well as information entered into search fields. The data includes location information and preferences, items viewed and purchased, and interests, preferences, age, location, or other characteristics inferred from user behavior and content engagement. It also includes device and technical identifiers such as device type, operating system, browser type,

persistent user identifiers that enable recognition across sessions and websites, and approximate geolocation data derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information." The Website's cookie banner and cookie-preferences interface materially mislead users about Defendant's data-collection practices. Defendant presents users with the illusion of privacy controls while simultaneously enabling third parties to monitor users' online behavior in real time. These practices deprive users of control over their personal information and violate fundamental privacy protections, particularly where the data relates to sensitive health and fertility-related interests.

5.    Plaintiff visited the Website in 2025, including as recently as May 2025, to browse, research, and purchase hormone-monitoring, fertility-related products and read related articles. Plaintiff accessed the Website for its intended purpose and engaged with product pages and related informational content. Plaintiff clicked "Customize", rejected the sale or sharing of personal information and all non-necessary cookies, and selected "Save and continue." In reliance on Defendant's representations, Plaintiff reasonably believed that the Website would honor these selections and would not transmit her browsing activity or personal data to marketing and advertising third parties.

6.    Defendant's conduct enabled third-party Tracking Entities to unlawfully intercept and access Plaintiff's Sensitive Information and private communications, intrude upon Plaintiff's fundamental right to privacy, and misrepresent the Website's data-collection and tracking practices. As a result, Defendant violated the Federal Wiretap Act, 18 U.S.C. § 2510 et seq.; the California Invasion of Privacy Act ("CIPA"), including Cal. Penal Code § 631 and § 638; Intrusion Upon Seclusion; violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.; violation of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1770 et seq.; common law fraud, deceit, and/or misrepresentation and unjust enrichment. Plaintiff brings this action on behalf of herself and a class of similarly situated users who were harmed by Defendant's deceptive and unlawful surveillance practices.

*Wiretap Violations*

7.      Federal and state legislatures have recognized and addressed individuals' privacy expectations in communications transmitted over wired and electronic systems.

8.      Congress enacted the Federal Wiretap Act to prohibit the unauthorized interception of electronic communications.

9.      California enacted the California Invasion of Privacy Act, which imposes civil liability on any person who, willfully and without the consent of all parties to a communication, attempts to read or learn the contents or meaning of any message or communication while it is in transit or passing over any wire, line, or cable, or while it is being sent from or received at any place within California.[1]

10.     CIPA also prohibits the installation of a pen register or a trap and trace device without first obtaining a court order.[2]

11.     Defendant implemented and utilized the Tracking Tools to intercept, read, disclose, and record Users' Sensitive Information. The Website does not provide notice of, or obtain consent for, these practices.

12.     Users of the Website, including Plaintiff, have an interest in maintaining control over their Sensitive Information and in preventing its misuse.

13.     Users of the Website have been harmed by Defendant's conduct, resulting in violations of the Federal Wiretap Act and CIPA. In addition to monetary damages, Plaintiff seeks injunctive relief requiring Defendant to either remove the Tracking Tools from the Website or obtain appropriate consent from Users.

14.     Plaintiff's claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons. Plaintiff seeks relief in this action individually and on behalf of Users of the Website for violations of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e); Intrusion Upon Seclusion; violations of CIPA, Cal. Penal Code §§ 631 & 638; violations of the CLRA, Cal. Civ. Code §§ 1770 et seq.; violations of the UCL. Cal. Bus. & Prof. Code §§ 17200, et seq.; Common Law Fraud, Deceit and/or Misrepresentation; and Unjust Enrichment.

---

[1] Cal. Penal Code § 631(a).
[2] Cal. Penal Code § 638.51.

**JURISDICTION AND VENUE**

15.    This Court has original jurisdiction over all causes of action herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), because there are more than 100 members in the proposed Classes, Defendants are citizens of a different state than at least one member of the proposed Class, and the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs. Venue is proper in this District because the Plaintiff resides in this District.

16.    This Court has personal jurisdiction over Defendants because: (1) Defendants are each a citizen of, and have their principal place of business in the state of California; (2) Defendants are authorized to do business and in fact regularly conduct and transact business in the state of California; and/or (3) the claims alleged herein took place primarily in California, where Defendants managed the operation of miracare.com.

17.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 Defendants are each a citizen of and maintain their principal place of business in this District.

**PARTIES**

18.    Plaintiff is, and at all relevant times was, a resident of California who used Defendant's Website and mobile application (the "App") in California. Plaintiff is a very active user of both the App and the Website: she reads Defendant's newsletter on the Website approximately three times per week and uses the App regularly to access health-related monitoring, including features that track health-related information. She accesses the Website primarily on her mobile phone, but also uses a computer to view, via Google Chrome, newsletters that redirect her to the Website. Plaintiff is often simultaneously logged in to her Facebook account on the same Google Chrome browser while using the Website. As a matter of course, Plaintiff rejects the use of non-essential cookies when presented with cookie choices on websites.

19.    Defendant Mira is in the business of selling hormone tracking devices, testing wands, and other fertility-related products through its Website at https://miracare.com, including the web store located at https://shop.miracare.com, to users across the United States. Defendant is a Delaware corporation headquartered in Pleasanton, California.

# FACTUAL ALLEGATIONS

## *The Federal Wiretap Act*

20.     The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications.[3]

21.     The Wiretap Act initially focused on government wiretapping. Congress later became concerned that technological developments such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" had outpaced the statute. [4] Thus, in 1986, Congress amended the Wiretap Act through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions comparable to government intrusions.[5]

22.     The ECPA primarily focused on two types of computer services that were prominent in the 1980s: (i) electronic communications between users; and (ii) remote computing services like cloud storage or third-party processing of data and files.[6]

23.     Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person "intentionally intercepts . . . or procures any person to intercept . . . any . . . electronic communication" (2511(1)(a)), "intentionally discloses . . . To any other person the contents of any . . . Electronic communication, knowing or having reason to know that the information was obtained through the interception of a . . . Electronic communication in violation of this subsection" (2511(1)(c)), or "intentionally uses . . . The contents of any . . . Electronic communication, knowing or having reason to know that the information was obtained through the interception of a . . . Electronic communication in violation of this subsection (2511(1)(d)).

24.     The Wiretap Act initially concerned the government's use of wiretaps, but Congress became concerned that technological advancements such as "large-scale mail operations, computer-to-

---

[3] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).
[4] Senate Rep. No. 99-541, at 2 (1986).
[5] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).
[6] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).

computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" were rendering the statute out of date. 18 U.S.C. §2511(2)(d).

25.    While Users communicated with Defendant on the Website through their browsing, the contents[7] of those communications were intercepted by third parties through the Tracking Tools.

26.    Defendant intentionally implemented the Tracking Tools on the Website to intercept Plaintiff's communications and transmit those communications to third parties for use in advertising and marketing activities.

27.    Plaintiff neither knew of nor consented to the exposure of her legally protected communications with Defendant to third parties.

### The California Invasion of Privacy Act (CIPA)

28.    The California Invasion of Privacy Act ("CIPA") was enacted in 1967 for the expressly stated purpose "to protect the right of privacy of the people of [California]."[8]

29.    California legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[9]

30.    To protect people's privacy, California legislators broadly protected communications being sent from or received in California through the enactment of CIPA.[10] Indeed, CIPA "is a declaration of legislative finding and intent; it speaks of preventing eavesdropping and other invasions of privacy . . . ."

31.    Section 631 (a) of CIPA prohibits the unauthorized tapping of lines, and willfully and without the consent of all parties to the communication, reading or attempting to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable."[11]

---

[7] The contents of Plaintiff's and users' communications include: 1) search terms submitted to the site; 2) the location and contents of webpages visited by users; and, 3) the PII discussed in Section III(A).
[8] Cal. Penal Code § 630.
[9] *Id.*
[10] Cal. Penal Code §§ 631-32.
[11] Cal. Penal Code § 631(a).

32.     Defendant was not authorized to and did not obtain the consent of Plaintiff and Class Members to intercept, record, or read the contents of their communications with Defendant's website, including through the deployment of tracking tools like the TikTok Pixel, in violation of CIPA § 631.

33.     Section 638 of CIPA prohibits the installation or use of "a pen register or a trap and trace device without first obtaining a court order . . . ."[12]

34.     "Pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).[13]

35.     "Trap and trace device" is defined as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

36.     Given CIPA's purpose to protect Californians' privacy, "it seems very unlikely that the state Legislature meant to permit the installation and implementation of pen registers 'so long as those devices also record the contents of third party's communications." *Gabrielli v. Haleon US Inc.*, No. 25-cv-02555-WHO, 2025 U.S. Dist. LEXIS 169503, at *34 (N.D. Cal. Aug. 29, 2025).

37.     Defendant was not authorized by any court order to use Tracking Tools, including the TikTok Pixel, to record and capture Plaintiff's and Class Members' communications with the Website in violation of CIPA § 638.

**A.      How Websites Function**

38.     Websites are hosted on servers, in the sense that their files are stored on and accessed from publicly accessible servers, where the server may also run software to manage and monitor the website. However, websites are, in large part, "run" on a user's internet browser, as the browser loads and processes the webpage's code to display the webpage and run various code scripts that provide certain functionality to the website.

---

[12] Cal. Penal Code § 638.51.

[13] *Id.* § 638.50(b).

39.    A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[14]

40.    Each webpage has a unique address in the forms of uniform resource locator (URL), internet protocol address (IP address), and path. Two webpages cannot be stored at the same address.[15]

41.    When a user navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the URL), that user's browser contacts the DNS (Domain Name System) server, which translates the URL of that website into a unique IP (Internet Protocol) address.[16]

42.    An IP address is "a unique address that identifies a device on the internet or a local network."[17] Essentially, an IP address is:

> The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works. *Id.*

43.    When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfils this request, it issues an HTTP response, which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the user's browser.[18]

44.    This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

---

[14] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Dec. 23, 2025).
[15] *Id.*
[16] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Dec. 23, 2025).
[17] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Dec. 23, 2025).
[18] *Id.*

CLASS ACTION COMPLAINT

45.     The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[19] as depicted below:



Figure 1 - Mozilla's diagram of a URL, including parameters[20]

46.     Website owners or web developers write and manage the URLs for their websites.

47.     URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[21] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

48.     The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[22] Today, UTF-8 is the Internet's most common character encoding.[23]

49.     URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[24] To demonstrate:



Figure 22 – Demonstrating URL encoding and decoding[25]

---

[19] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).

[20] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Dec. 23, 2025).

[21] *Id.*

[22] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Dec. 23, 2025).

[23] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Dec. 23, 2025).

[24] *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct. 18, 2020), https://gochyu.com/blog/url-encode-decode (last visited Dec. 23, 2025).

[25] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Dec. 23, 2025).

CLASS ACTION COMPLAINT

50.    Similarly, parameters and metadata can be parsed and separated into easily reviewed, searchable formats.



*Figure 33 – Sample webpage used to demonstrate a webpage URL*

CLASS ACTION COMPLAINT



*Figure 44 – Request URL of sample webpage from Figure 3, encoded for transmission (compare with decoded URL in Figure 3)*

| | |
|---|---|
| ✕  Headers  **Payload**  Preview  Response  Initiator  Timing  Cookies | |
| ▼ **Query String Parameters**     [ View source ]   [ View URL-encoded ] | |
| id | 576288402717120 |
| ev | PageView |
| dl | https://shop.miracare.com |
| rl | https://www.google.com |
| if | false |
| ts | 1766523800468 |
| sw | 2048 |
| sh | 1152 |
| cud[external_id] | ######*#–##*#–####–*#**–#*#***##**## |
| ncud[external_id] | ######*#–##*#–####–*#**–#*#***##**## |
| ud[external_id] | 959a52aea99360905e21456cd856e7c2356e11ac746c4e9b142a0c696ca1fdc1 |
| aud[external_id] | 959a52aea99360905e21456cd856e7c2356e11ac746c4e9b142a0c696ca1fdc1 |
| v | 2.9.248 |
| r | stable |
| ec | 0 |
| o | 12316 |
| fbp | fb.1.1764948193215.1956620433 |
| pm | 1 |
| hrl | f441c5 |
| ler | other |
| cdl | API_unavailable |
| plt | 1668.9000000059605 |
| it | 1766523800169 |
| coo | false |
| eid | PunnaXmav9AkbpVCBBRNS |
| tm | 1 |
| cs_cc | 1 |
| cas | 2618813499078636346,24777883468535787,24023096977284854,7404013706344032,4999640066809459,4325869710844268,4768970113134803,4119317204781929,4204715279590202,4244842918870626,4153934801309251,4168220933258558,4158779524216999,4184747201614789,6043555969002693,4104448352975982,5850423415032078,4393301300714359,5729109920463879,3866456653452031,4068466299875539,3215527785229585,2683162235134209,3000645619967768,2561239013988657,3847984118560293,2974487505899179,1376700869120348,2474549739330292,3177298549011947,3100307030039638,2372740539521366,2621051574682036,2702957086384215,2577617102258600,2340998315992923,2246417392144425 |
| dlc | |

*Figure 55 – Appearance of decoded, parsed data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

51.     After sending the Request URL, and after the server responds to the Request URL, the user's browser assembles the response packets sent by the server back into the HTML code of the webpage, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the webpage's HTML code.[26] This is the visible, and usually interactable, website that appears on users' monitors.

---

[26] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Dec. 23, 2025).

CLASS ACTION COMPLAINT

52.     To provide more complex website functionalities, website developers will include more complex commands written in other computer programming languages such as JavaScript snippets within the HTML documents.[27]

53.     Such complex tasks include streaming videos, order forms and inventory management, or code used to monitor and report user activity.

54.     In short, the Internet relies on a constant back and forth stream of requests to modify webpage content, navigate to new webpages, make internet purchases, or otherwise generally browse websites.

55.     Unbeknownst to users, as they browse and use the Website, the Tracking Tools capture and record, in real time, both incoming and outgoing requests that make up their experience on the Website.

**B.     Presentment of Terms:**

56.     When first visiting the https://shop.miracare.com ("Website"), the Terms of Use ("Terms") are presented at the bottom of the webpage, out of view, in a browsewrap manner. The link to the Terms is listed under a nondescriptive heading for "More" and appears in the same font and color as all the other links. The Terms link is one of many other links listed on the bottom of the Website , which makes it difficult for the users to locate the Terms. Additionally, pop-ups for various promotions, such as Cyber Monday Sales, block the entire screen, making it even more difficult for the users to navigate to the Terms section. *See below:*

---

[27]     *See      JavaScript      Basics,*   MOZILLA,           https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Dec. 23, 2025).

CLASS ACTION COMPLAINT



*Figure 6- Webpage showing the promotional pop-up's*

57.    When users add a product to their cart, they are presented with the total price of their cart, and an option to checkout. Users are still not presented with the Terms. *See Figure 7 below:*



*Figure 7- Webpage showing the AddToCart page*

58.    When Users proceed to checkout, the Terms are presented at the bottom of the webpage. Users are never asked to affirmatively agree to the Terms or a acknowledge the Terms. *See Figure 8 below:*

CLASS ACTION COMPLAINT



*Figure 8- Sample checkout page showing the Terms linked at the bottom of the page*

**C.    Defendant's Website and the Tracking Tools Spy on Users Like Plaintiff.**

59.    Defendant operates the Website and has installed the Tracking Tools. These Tracking Tools operate invisibly, tracking users' activity surreptitiously.

60.    Generally, the Tracking Tools collect information about users' site activity when events specified by Defendant—like adding a product to the shopping cart—are triggered. The Tracking Tools associate this information back to the website operators that installed the Tracking Tools via some identification number, such as a Pixel ID.[28]

61.    Parameters added to events by Defendant determine just how much data is collected, and how specific that data is.

---

[28] *See generally Get Started*, Meta, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Dec. 23, 2025) (noting that the Pixel ID is part of the base code, which will result in the "download" of "a library of functions" related to that Pixel ID used "for conversion tracking"); *Conversion Tracking for Websites*, X Business, *How to create and access TikTok Pixel ID*, TikTok, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (instructing users that they must insert their pixel ID into the base code for operation tracking); https://ads.tiktok.com/help/article/how-to-create-and-access-tiktok-pixel-id?lang=en (last visited Dec. 23, 2025) (instructing users to create Pixel ID to setup and link data tracking on website).

CLASS ACTION COMPLAINT

62.    Parameters are strings of text that website owners add to a URL to track and organize their webpages.[29] URL parameters include key-value pairs formatted as "key=value":

  a. The "key" is what the website owner wants to adjust or track (e.g., "color" or "ev" for event)

  b. The "value" is the specific setting or data for that parameter (e.g., "yellow" or "AddToCart" for a user taking the action of adding a product to their online shopping cart)



*Figure 6 - Diagram of a URL displaying how parameters function[30]*

### 1.    The TikTok Pixel

63.    Defendant operates the Website and has installed on the Website software created by TikTok – known as a "tracking pixel" – to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

64.    The TikTok Pixel begins intercepting information as soon as the TikTok Pixel loads onto users' browsers.[31]

---

[29] *URL Parameters: What They Are and How to Use Them Properly*, BACKLINKO (Mar. 13, 2025), https://backlinko.com/url-parameters (last visited Dec. 23, 2025).
[30] *Id.*
[31] *See* Aaron Katersky, *TikTok has your data even if you've never used the app: Report*, ABCNEWS (Mar. 16, 2023, 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249#:~:text=Webpages%20associated%20with%20everything%20from,consent%2C%20the%20Feroot%20report%20said. (last visited Dec. 23, 2025).

65.    To use the TikTok Pixel, the website operators must include the specific pixel IDs associated with their websites, which allows TikTok to link the collected data back to their individual TikTok business profiles.[32]

66.    Defendant's TikTok Pixel ID is included in transmissions sent to and from users' devices, as seen in *Figures 9* and *12*—the "sdkid" parameter in Figure 9 references the TikTok Pixel code library for Defendant's Pixel ID, whereas the "code" variable in Figure 12 identifies the TikTok Pixel ID, both of which reference the Pixel ID as "C60KT716C8J74AQR8DE0".

67.    The TikTok Pixel shares information when an action is taken on the Website, based on events set up by Defendant.[33] These events can include adding an item to a cart, making a purchase, when a specific button or element is clicked (like the search field), and when a URL with a specified keyword is visited.[34]

68.    TikTok Pixel users make use of events to collect even more specific data on users' activities, including the actions taken (e.g., clicking buttons, pages loaded, etc.), the currency used for the purchase, the value of the purchase, and the type of content purchased.[35]

69.    The TikTok Pixel also collects:

        a.    The time website actions took place;

        b.    The IP address (which is used to determine the geographic location of an event);

        c.    Device information, including make, model, operating system, and browser information);

        d.    Cookies that can be used to identify users; and

        e.    Metadata and button clicks.[36]

70.    The information the TikTok Pixel collects provides Defendant with a better understanding of who its customers are and how they navigate around the Website.

---

[32] *See generally Troubleshoot with Pixel Helper*, TikTok, *https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en* (last visited Dec. 23, 2025) (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).
[33] *About TikTok Pixel*, TɪᴋTᴏᴋ, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Dec. 23, 2025).
[34] *About Standard and Custom events*, TɪᴋTᴏᴋ, https://ads.tiktok.com/help/article/standard-events-parameters?lang=en (last visited Dec. 23, 2025) (describing standard "events"); *How to Set Up Events and Parameters with Events Builder*, TɪᴋTᴏᴋ, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Dec. 23, 2025) (describing how to designate events).
[35] *How to Set Up Events and Parameters with Events Builder*, TɪᴋTᴏᴋ, https://ads.tiktok.com/help/article/how-to-set-up-events-and-parameters (last visited Dec. 23, 2025) (describing how to designate events).
[36] *About TikTok Pixel*, TɪᴋTᴏᴋ, https://ads.tiktok.com/help/article/tiktok-pixel (last visited Dec. 23, 2025).

71.     TikTok's "Advanced Matching" features allows Defendant to "match customer information such as email and phone number along with actions people take on [the Website]."[37] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[38] TikTok then provides Defendant with custom audiences based on website visitor events, like page views or purchases, to model lookalike audiences.[39] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[40]

72.     Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data TikTok has acquired and accumulated about hundreds of millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.[41]

73.     Defendant used the TikTok Pixel to monitor and log, in real time, when users clicked on specific products, loaded webpages, add specific products to cart, login to the Website, remove items from cart, and proceed through the checkout process to payment and shipping.

74.     Here, the tracked products include: hormone monitors, prenatal supplements, fertility tests and kits, and menopause testing kits, many of which are designed to operate with a separate Mira App. Information related to the tracked products is sensitive in nature, especially where users can be confirmed as purchasers of such products, rather than mere browsers.

75.     The TikTok Pixel also uses cookies to identify users (the _fbp cookie[42] is used to identify Facebook and non-Facebook users, the _ttp and tta_attr_id_mirror cookies are used to identify TikTok

---

[37] *About Advanced Matching for Web*, TikTok, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Dec. 23, 2025).

[38] *How to set up Automatic Advanced Matching*, TikTok, https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Dec. 23, 2025).

[39] *Get started with the TikTok Pixel: a small business guide*, TikTok (Sept. 6, 2024), https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (benefits of using the TikTok Pixel).

[40] *See How to use TikTok Pixel: TikTok conversions tracking*, LeadsBridge (May 2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Dec. 23, 2025).

[41] *Id.*

[42] *See* Cookies Policy, Facebook, https://www.facebook.com/privacy/policies/cookies?subpage=subpage-1.7 (noting the use of _fbp cookie to track users regardless of their status as FB users)

users[43]), and to capture hashed email, which can still be de-anonymized through the use of a tool called a "reverse lookup table."[44]

76.     Plaintiff had a reasonable expectation that Plaintiff's Sensitive Information would not be exposed to third-party trackers placed by Defendant.

77.     Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and access tons of data to run successful ad campaigns.[45]

78.     TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve their own products and services and to generate their own benchmarking reports to share with other TikTok customers.[46]

79.     According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately links to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal health."[47] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[48]

80.     An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:

---

[43] *See* *https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies* (last visited Dec. 23, 2025).

[44] *Can someone please explain reverse look up tables?*, SOFTWARE ENGINEERING, https://softwareengineering.stackexchange.com/questions/277152/can-someone-please-explain-reverse-look-up-tables (last visited Dec. 23, 2025).https://softwareengineering.stackexchange.com/questions/277152/can-someone-please-explain-reverse-look-up-tables (last visited

[45] *See Benefits of using the TikTok Pixel*, TIKTOK, https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel?acq_banner_version=73412989 (last visited Dec. 23, 2025).

[46] *TikTok Business Products (Data) Terms*, TIKTOK (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Dec. 23, 2025).

[47] *See Aaron Katersky, TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Dec. 23, 2025).

[48] *Id.*



*Figure 8 – Home page of Website*



*Figure 9 – Using a browser's "developer tools" on a Mira webpage shows the Website loading TikTok Pixel's code onto the user's browser*

**CLASS ACTION COMPLAINT**

*Figure 10 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website*

81. The Website instantly sends communications to TikTok when a user views the page and tracks page interactions. In the example below, *Figure 10* shows the various TikTok scripts being run by Defendant when a user visits the webpage depicted in *Figure 11*, and the electronic impulses being sent TikTok to add to their collection of user behavior:



*Figure 11 – Sample product on the Website*



*Figure 12 – Information collected via the TikTok Pixel when a user visits the sample webpage from Figure 11*

**CLASS ACTION COMPLAINT**

82.    To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms").

83.    The TikTok Terms inform website owners using the TikTok Pixel that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[49]

84.    The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts, and subsequently match those accounts with the users' corresponding event data.[50]

85.    TikTok obligates TikTok Pixel users, such as Defendant, that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[51] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

86.    TikTok educates or reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[52]

87.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel, and ignored TikTok's warnings to safely handle its users' data and warn its users that the Website would disclose their information in a manner that threatened their private information.

---

[49] *TikTok Business Products (Data) Terms*, TᵢᴋTᴏᴋ, (July 29, 2024), https://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Dec. 23, 2025).
[50] *Id.*
[51] *Id.*
[52] *Id.*

### 2.    The Facebook Pixel

88.    Facebook offers its own tracking pixel (the "Facebook Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

89.    The Facebook Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[53]

90.    Upon creating a Pixel, a Pixel ID (also called a DataSet ID by Meta), is generated.[54] This Pixel ID is used to initialize the Pixel, either by allowing Meta to fetch a pre-determined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used receive the collected data when programming the Pixel directly into a website.[55]

91.    This Pixel ID must match "a known Pixel ID" in Meta's system,[56] and is transmitted by the Meta Pixel.[57]

92.    As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[58]

93.    Once added to a webpage, the Pixel begins intercepting information as soon as a user visits the webpage and the Pixel loads onto the user's browser.[59]

94.    The Pixel is employed by Defendant to gather, collect, and then share user information with Facebook.[60] Receiving this information enables Facebook and Defendant to build valuable personal

---

[53] *Setup and install the Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Dec. 23, 2025).
[54] *Id.*
[55] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Dec. 23, 2025) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").
[56] *Pixel Helper*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/support/pixel-helper (last visited Dec. 23, 2025)
[57] *Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Dec. 23, 2025).
[58] *Get Started*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Dec. 23, 2025) ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions.").
[59] *See* Mario Neto, *What is the Facebook Pixel – Different ways to collect data to boost your ads performance*, BIRCH BLOG (May 13, 2025), https://bir.ch/blog/what-is-the-facebook-pixel#:~:text=Putting%20it%20simply%2C%20the%20Meta,all%20from%20a%20single%20snippet. (last visited Dec. 23, 2025).
[60] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited Dec. 23, 2025).

- 25 -

profiles for Website users to inform its targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[61]

95. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location and finding the people who are most likely to take action and view content.[62]

96. Once implemented on a website, the Facebook Pixel begins to share users' information the moment a user lands on the website.

97. When a Facebook user logs onto Facebook, tracking cookies, including the c_user cookie, the data cookie, and the fr cookie, are automatically created and stored on the user's device.[63] These cookies allow Facebook to link the data it receives through the Facebook Pixel to individual Facebook users.

98. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.



*Figure 13 – Sample c_user cookie, containing FID of test account created by Plaintiff's counsel to investigate the Facebook Pixel*

99. The FID can simply be appended to www.facebookcom/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Using the FID from *Figure 11*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the UID, as depicted below:

---

[61] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited Dec. 23, 2025).
[62] *See Audience ad targeting*, FACEBOOK, https://www.facebook.com/business/ads/ad-targeting (last visited Dec. 23, 2025).
[63] *Cookies Policy: What are cookies, and what does this policy cover?*, *Facebook* (Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Dec. 23, 2025).



*Figure 14 – Sample Facebook account created by Plaintiff's counsel to investigate the Facebook Pixel, with FID highlighted in URL*

100.    The Pixel tracks user-activity on web pages by monitoring events,[64] which when triggered, causes the Pixel to automatically send data – here, users' Sensitive Information – directly to Facebook.[65] Examples of events utilized by websites include: (i) a user loading a page with a Pixel installed (the "PageView event");[66] (ii) when a user views pre-designated content, like products for sale (the "ViewContent" event);[67] (iii) when a user clicks a pre-designated button, like "Add to Cart" (the "SubscribedButtonClick" event); and (iii) when a user adds a product to their shopping cart (the

---

[64] *About Meta Pixel*, FACEBOOK, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (Dec. 23, 2025).
[65] *See generally id.*
[66] *Specifications for Meta Pixel standard events*, FACEBOOK, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Dec. 23, 2025).
[67] *Reference: standard events*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Dec. 23, 2025).

CLASS ACTION COMPLAINT

"AddToCart" event, collectively with PageView event, ViewContent event, and SubscribedButtonClick event, the "Pixel Events").[68] The Website utilizes all four Pixel Events.[69]

101.    Defendant uses the Facebook Pixel to monetize its Website users' Sensitive Information.

102.    Facebook independently benefits from the data collected through the Facebook Pixel by using the harvested data to sell targeted advertising services. Through the use of users' Sensitive Information, Facebook refines its marketing algorithms, profiting from the ability to more accurately target potential customers.

103.    Defendant's nefarious use of the Facebook Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing the sample product on the Website from *Figure 11*.



*Figure 15 – Facebook Pixel tracking a user landing on the webpage from Figure 11 through the "PageView" event*

---

[68] *Id.*

[69] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, FACEBOOK, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Dec. 23, 2025).

CLASS ACTION COMPLAINT

*Figure 16 – Facebook Pixel tracking a user viewing the product from Figure 11 through the "ViewContent" event*

104.    When a business applies with Facebook to use the Facebook Pixel, it is provided with detail about its functionality, including with respect to private information.[70]

105.    To make use of the Facebook Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Facebook Terms").

106.    The Facebook Terms informs website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[71]

107.    The Facebook Terms are transparent that Meta will use the Pixel Event information and contact information "to match the contact information against user IDs, as well as to combine those user IDs with corresponding [Pixel Event information]."[72]

---

[70] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited September 17, 2025) (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[71] *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJII&_rdr (last visited September 17, 2025).

[72] *Id.*

108.    Facebook directs parties implementing the Facebook Pixel—here, Defendant—to encrypt request information[73] *before* data can be shared.[74]

109.    Facebook further provides Facebook Pixel users, such as Defendant, guidance on responsible data handling, and details how data is acquired, used, and stored, including which information is shared with Facebook.

110.    Facebook educates or reminds Facebook Pixel users of their responsibility to inform their users of their website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third-party.[75]

111.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Facebook Pixel, and ignored Facebook's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

### 3.    *The Twitter Pixel*

112.    X Corp. f/k/a Twitter ("Twitter") also offers its own website tag that can be implemented into websites to track users' site actions or conversions (the "Twitter Pixel").

113.    To make use of the Twitter Pixel, website owners, such as Defendant, must take several affirmative steps: They must generate the Twitter Pixel and create events to track, implement the Twitter Pixel base code across their website, and implement event code in key locations on their website, like when a user makes a purchase.[76]

114.    With each event, website owners like Defendant can select the user action they want to track and the parameters to share about the action.

---

[73] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Facebook Pixel method which makes users' information visible. *See id.*
[74] *Id.*
[75] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (Dec. 23, 2025).
[76] *X Pixel*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Dec. 23, 2025).

115.    Events can include viewing a page, making a purchase, adding an item to the shopping cart, using the search bar, adding a product to the wish list, adding payment information, and customizing a product.[77]

116.    Parameters can include the contents of the action, the search terms used on the website, the email address of the user taking the action, the value of the product purchased, and the currency the purchase was made in.[78]

117.    As soon as the Twitter Pixel is placed on a website, it begins to collect information, including the cookie IDs of users, to match them to Twitter users for the purpose of developing custom audiences to market and advertise to.[79]

118.    Twitter allows website owners, such as Defendant, to create "Website Activity Audiences," a type of custom audience, which enables Twitter to collect and analyze user activity for users who have visited or taken certain actions on Defendant's Website. Once an audience is created and the Twitter Pixel collects 100 Twitter users, the audience will be ready to use for targeting in ad campaigns.[80]

119.    The data collected by the Twitter Pixel informs both Defendant and Twitter how to optimally target custom audiences with advertising based on the geo, gender, age, and device criteria specified by Defendant.[81]

120.    An image of the invasive Twitter code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to Twitter to add to its collection of user behavior when a user visits the sample webpage in *Figure 11*:

---

[77] *Event Types and Parameters*, X BUSINESS, https://business.x.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites (last visited Dec. 23, 2025).
[78] *Id.*
[79] *Website Activity Custom Audiences*, X BUSINESS, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity (last visited Dec. 23, 2025).
[80] *Id.*
[81] *Id.*

*Figure 19 - Twitter Pixel active on the Website*

121. To use the Twitter Pixel, Defendant agreed to Twitter's policies for conversion tracking and custom audiences (the "Twitter Terms").

122. The Twitter Terms are transparent that Twitter will process users' data to match contact details against corresponding accounts, and subsequently match those accounts with the users' corresponding event data.[82]

123. Twitter obligates Twitter Pixel users, such as Defendant, that they "must provide their application customers with legally sufficient notice that they are working with third parties to collect customer data through their application for purposes of conversion tracking and serving ads targeted to customers' interests, and obtain legally sufficient consent from their customers for these activities."[83]

124. Twitter makes clear that the onus is on Defendant to provide all necessary transparency notices and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Twitter.

125. Twitter educates or reminds TwitterPixel users of their obligation to be honest with their users and not to select "targeting criteria that could reveal sensitive information" about users.[84]

126. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the

---

[82] *Policies for conversion tracking and custom audiences*, X BUSINESS, https://business.x.com/en/help/ads-policies/campaign-considerations/policies-for-conversion-tracking-and-custom-audiences#:~:text=*%20Advertisers%20may%20not%20create%20advertisements%20which,is%20otherwise%20prohibited%20by%20our%20Ads%20Policies. (last visited Dec. 23, 2025).
[83] *Id.*
[84] *Id.*

CLASS ACTION COMPLAINT

Twitter Pixel, and ignored Twitter's warnings to safely handle its users' data and warn its users' that the Website would disclose their information in a manner that threatened their Sensitive Information.

### 4.    The Pinterest Tag

127.    Defendant has also installed a tracking pixel on its Website created by social media site, Pinterest (the "Pinterest Tag").

128.    The Pinterest Tag is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions they take, and later target these visitors with ads on Pinterest.[85]

129.    To make use of the Pinterest Tag, the website owner must include its Pinterest tag ID in its base code.[86]

130.    The Pinterest tag ID identifies which code needs to be sent to the user's browser to track website owner-designated data points through specified "events",[87] and to establish which Pinterest account will receive the data upon collection.[88]

131.    Once a website owner adds the base code of the Pinterest Tag, website owners can add "event codes" so the Pinterest Tag tracks specific actions that visitors take on their websites, such as viewing a page, viewing a video, checking out, and other specified events.[89]

132.    Website owners like Defendant then send the collected information to Pinterest. Pinterest recommends that website owners transmit the IP address of website visitors for all conversion events.[90]

133.    Without the implementation of any other features, the Pinterest Tag tracks and transmits the URL currently being viewed by the website visitor. Additionally, the Pinterest Tag reads and uses

---

[85] *Install the Pinterest tag*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last visited Dec. 23, 2025).

[86] *Add the base code to your website*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-base-code (last visited Dec. 23, 2025).

[87] *Add event* codes, PINTEREST, https://help.pinterest.com/en/business/article/add-event-codes (last visited Apr. 21, 2025)

[88] *See Add the base code to your website*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-base-code (last visited Dec. 23, 2025); *Set up the Pinterest tag with Google Tag Manager*, https://help.pinterest.com/en/business/article/google-tag-manager-and-pinterest-tag (highlighting that integrating Pinterest Tags with third party data tracking systems requires a Pinterest tag ID to know which Pinterest conversion account should receive the tracked data) (last visited Dec. 23, 2025).

[89] *Add event* codes, PINTEREST, https://help.pinterest.com/en/business/article/add-event-codes (last visited Dec. 23, 2025).

[90] *Track conversion events*, PINTEREST, https://developers.pinterest.com/docs/api-features/track-conversion-events/ (Dec. 23, 2025).

first-party cookies to identify the Pinterest user currently viewing the website through a personalized Pinterest "User ID," even when the user is logged out of Pinterest.[91]

134. Website owners can also, in conjunction with the Pinterest Tag, enable a feature known as "automatic enhanced match" to determine the exact identity of Pinterest users who visit the website.[92]

135. When used in conjunction with automatic enhanced match, the Pinterest Tag collects and transmits to Pinterest users':

  a.    Emails;

  b.    First and last names;

  c.    Phone numbers;

  d.    Genders;

  e.    Birth dates;

  f.    External IDs; and

  g.    Cities, States, zip codes and countries.[93]

136. This data can be used by Pinterest to "match more of [a] website['s] visitors and conversions to people on Pinterest, which can lead to improvements in [ad] campaign performance . . . and audience reach . . . ."[94]

137. Pinterest uses this data to help advertisers like Defendant gauge the effectiveness of their ad campaigns, optimize the return on their ad spending, and broaden their audience reach.[95]

138. The Pinterest tag also sends the "tid" parameter, which identifies the website owner's Pinterest tag ID.[96] Here, the "tid" parameter in Pinterest Tag transmissions from Defendant's site contains Defendant's Pinterest tag ID of 2619519106450. This data is intercepted the moment users send communications to or receive communications from the Website.

---

[91] *View tag parameters and cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Dec. 23, 2025).

[92] *Enable automatic enhanced match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Dec. 23, 2025).

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] Pinterest tag parameters and cookies, , https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Dec. 23, 2025). *Pinterest tag parameters and cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Dec. 23, 2025).

139.    Additionally, unless websites make use of a specific "limited data processing flag," Pinterest employs this data, such as names, phones numbers, emails and IP addresses, to conduct research on Pinterest usage and to market its own services.[97]

140.    Pinterest also sends the data to business partners and other vendors.[98]

141.    Defendant's use of the Pinterest tag on the Website is demonstrated below:



*Figure 20 – Pinterest Tag tracking a user landing on the webpage for the sample product from Figure 11 through the "pagevisit" event*



*Figure 21 – Pinterest Tag tracking a user adding the sample product from Figure 11 to their online shopping cart through the "addtocart" event*

142.    When a website owner applies with Pinterest to use the Pinterest Tag, the website owner must agree to Pinterest's Developer and API Terms of Service (the "Pinterest Terms"), part of which requires agreeing that Pinterest may collect and use website users' information.[99]

143.    The Pinterest Terms further provides Pinterest Tag users, like Defendant, guidance on their responsibilities regarding privacy.

---

[97] *Limited data processing*, PINTEREST, https://help.pinterest.com/en/business/article/limited-data-processing (last visited Dec. 23, 2025).

[98] *California Privacy Statement and Notice at Collection*, PINTEREST, https://policy.pinterest.com/en/notice-at-collection (last visited Dec. 23, 2025).

[99] *Developer and API Terms of Service*, PINTEREST, https://developers.pinterest.com/terms/ (last visited Dec. 23, 2025).

CLASS ACTION COMPLAINT

144.    Pinterest directs parties implementing the Pinterest Tag, such as Defendant, to clearly disclose its data practices and obtain its users' consent where required by law.[100]

145.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Pinterest Tag, and ignored Pinterest's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

**D.    The Tracking Tools are Pen Registers or Trap-and-Trace Devices.**

146.    California law defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

147.    A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

148.    The Tracking Tools are processes to record and identify the source of electronic communication by capturing incoming and outgoing electronic impulses and identifying dialing, routing, addressing, and signaling information generated by users, who are never informed that the website is collaborating with the Tracking Entities to obtain their phone number and other identifying information.

149.    The Tracking Tools are "reasonably likely" to identify the source of incoming electronic impulses. In fact, they are designed specifically for that purpose. Both the IP addresses disclosed through the use of the Tracking Tools and the Pixel identifiers used to specify Defendant's business accounts held with the Tracking Entities identify the source of incoming signals to Plaintiff's device to the Tracking Entities.

150.    Defendant did not obtain Plaintiff's express or implied consent to be subjected to data sharing with the Tracking Tools for the purposes of fingerprinting and de-anonymization.

---

[100] *Id.*

151.   CIPA imposes civil liability and statutory penalties for the installation of pen register or trap-and-trace software without a court order. California Penal Code § 637.2; *see Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023). No court order to install a pen register or trap-and-trace device via the Tracking Tools was obtained by Defendant.

152.   Defendant did not obtain Plaintiff's or Class Members' express or implied consent to be subjected to data collecting and data sharing with the Tracking Entities for the purposes of fingerprinting and de-anonymization, nor did Defendant obtain a court order.

**E.     To the extent the Tracking Tools do not legally qualify as Pen Registers or Trap-and-Trace Devices, Defendant nonetheless facilitated the unauthorized interception of or access to the contents of Plaintiff's communications.**

153.   CIPA § 631(a) prohibits "three distinct and mutually independent patterns of conduct: (1) intentional wiretapping, (2) willfully attempting to learn the contents or meaning of a communication in transit over a wire, and (3) attempting to use or communicate information obtained as a result of engaging in either of the two previous activities." *Rodriguez v. Ford Motor Company*, 722 F. Supp. 3d 1104, 1113 (S.D. Cal. 2024) (citations omitted). Section 631(a)(iv) contains a fourth basis for liability for anyone "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the other three bases for liability." *Id.*

154.   The analysis for a violation of CIPA is the same as that under the federal Wiretap Act. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

155.   The Ninth Circuit has held that the "contents" of an online communication under federal wiretap law "refers to the intended message conveyed by the communication and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).

156.   Transmitted URLs that include both the path and the query string concern the intended message, or the substance of a communication. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 796 (N.D. Cal. 2022).

157.   Here, the network requests intercepted by the Tracking Entities include Request URLs that include the names of the products users browse and/or purchase.

158.     The contents of Plaintiff's communications with Defendant were intercepted by the Tracking Entities while communicating with Defendant in real time. The Tracking Tools begin intercepting information to the Tracking Entities as soon as the Tracking Tools load onto users' browsers.[101] The Tracking Tools send information to the Tracking Tools contemporaneously with users submitting the information via their browsers.

159.     The interception, duplication, and sending to the Tracking Entities occurred inside Plaintiff's browser before reaching any destination, therefore occurring while in transit. *See Esparza v. UAG Escondido A1 Inc.*, Case No. 23cv0102 DMS(KSC), 2024 U.S. Dist. LEXIS 24429, at *9 (S.D. Cal. Feb. 12, 2024).

160.     The Tracking Entities were third parties to Plaintiff's communications with Defendant.

161.     Defendant's use of the Tracking Tools enabled the Tracking Entities to intercept Request URLs that specify the content users accessed on webpages on the Website in violation of CIPA.

162.     "[A] conversationalist is betrayed equally by a wiretapper and by the willing conversation participant who surreptitiously allows that third party to wiretap." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1083 (C.D. Cal. 2021) (citing *Revitch v. New Moosejaw, LLC*, No. 18-cv-06827-VC, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019)).

163.     Defendant did not obtain Plaintiff's express or implied consent to allow the Tracking Entities to intercept the contents of their communications with the Website.

164.     Section 631(a) requires the prior consent of all parties to the communication. *Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022).

165.     Investigation by Plaintiff's Counsel revealed that the Website's cookie settings are set to allow tracking by default, meaning the Tracking Tools actively began to track users before users even given the chance to consent.

---

[101] *See* Aaron Katersky, *TikTok has your data even if you've never used the app: Report*, ABCNEWS (Mar. 16, 2023, 1:59 PM),https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249#:~:text=Webpages%20associated%20with%20everything%20from,consent%2C%20the%20Feroot%20report%20said. (last visited Dec. 23, 2025); Mario Neto, *What is the Facebook Pixel – Different ways to collect data to boost your ads performance*, BIRCH BLOG (May 13, 2025), https://bir.ch/blog/what-is-the-facebook-pixel#:~:text=Putting%20it%20simply%2C%20the%20Meta,all%20from%20a%20single%20snippet. (last visited Dec. 23, 2025); *Pinterest tag*, PINTEREST, https://developers.pinterest.com/docs/api-features/pinterest-tag/#:~:text=The%20Pinterest%20Tag%20allows%20you,Pinterest%20Tag%20has%20two%20components: (last visited Dec. 23, 2025).

166.   Therefore, unbeknownst to users, users are being tracked as soon as they land on the Website home page.

167.   Plaintiff visited the Website while its default settings were set by Defendant to track users before obtaining prior consent.

168.   Users who visit the website are shown a cookie banner, giving them the option to accept only "necessary" cookies.



*Figure 22 – The Cookie Banner shown to users who visit the Website*

169.   However, even if users choose to decline all unnecessary cookies, they are still tracked by the Tracking Tools and non-essential cookies on the Website.



*Figure 23- The Meta Pixel tracking a user who declined all unnecessary cookies*

170.   Defendant and the Tracking Entities benefitted from the interception of Plaintiff's communications by reading and subsequently using the intercepted communications to build detailed profiles based on Plaintiff's browsing habits, and using that profile to target Plaintiff with advertising.[102]

171.   The Tracking Entities independently benefit from the interception of Plaintiff's communications by using data collected by the Tracking Tools to improve their own products and advertising services, and marketing those advertising capabilities to other potential businesses seeking to market to users, including Plaintiff.[103]

---

[102] *See About Advanced Matching for Web*, TikTok, https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Dec. 23, 2025; *Meta Pixel*, Facebook, https://www.facebook.com/business/tools/meta-pixel (last visited September 17, 2025); *Enable automatic enhanced match*, Pinterest, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Dec. 23, 2025).

[103] *See TikTok Business Products (Data) Terms*, TikTok (July 29, 2024), http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited September 17, 2025); *Meta Business Tools Terms*, Facebook (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkei KEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Dec. 23, 2025).

CLASS ACTION COMPLAINT

**CLASS ALLEGATIONS**

172.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class"), defined as follows:

> Nationwide Class: All persons in the United States who visited the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "Class").

173.    California Subclass: All persons in California who visited the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "California Subclass"). Specifically excluded from the Classes is Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

174.    Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

175.    <u>NUMEROSITY</u>: At this time, Plaintiff does not know the number of Class Members but believes the number to be at least fifty given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

176.    <u>COMMONALITY</u>: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

    a. Whether Defendant shared Class Members' personal information with the Tracking Entities or other third parties;

    b. Whether Defendant obtained effective and informed consent to do so;

c.      Whether Class Members are entitled to statutory penalties; and

d.      Whether Class Members are entitled to injunctive relief.

177.    <u>TYPICALITY</u>: As a person who visited Defendant's Website and whose personal information was shared by Defendant, Plaintiff is asserting claims that are typical of the Class.

178.    <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

179.    <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## .CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Violation of the Federal Wiretap Act**
**18 U.S.C. § 2510, et seq.**
**(On Behalf of Plaintiff and the Nationwide Class)**

180.    Plaintiff incorporate by reference and re-allege each and every allegation set forth above in paragraphs 32 through 162 as though fully set forth herein.

181.    Plaintiff brings this claim individually and on behalf of the members of the proposed class against Defendant.

182.    Codified under 18 U.S.C. § 2510 et seq., the Federal Wiretap Act (the "Wiretap Act") prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

183.    The Wiretap Act confers a civil private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

184.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

185.    The Wiretap Act defines "contents" as "includ[ing] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

186.    The Wiretap Act defines "person" as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

187.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

188.    Defendant and the Tracking Entities are persons under the Wiretap Act.

189.    The Tracking Tools constitute a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

190.    The confidential communications between Plaintiff and the Nationwide Class and the Website, in the form of their Sensitive Information were intercepted by Tracking Tools placed by Defendant on the Website, and such communications were "electronic communications" under 18 U.S.C. 2510(12).

191.    The Wiretap Act is applicable to both the sending and receipt of communications.

192.    Plaintiff and the Class had a reasonable expectation of privacy in their electronic communications with the Website in the form of their Sensitive Information. Interception of Plaintiff and Nationwide Class Members' communications with the Website occurs in the regular course of using the Website, whether the users look for a product to track their health, or purchase health-related products from the Website. Moreover, the Tracking Entities are not a party to these communications.

193.    Defendant violated the Wiretap Act by procuring the Tracking Entities, and their Tracking Tools, to intercept Plaintiff's communications with Defendant, and for utilizing the

communications that the Tracking Entities intercepted and analyzed for advertising purposes. 18 U.S.C. § 2511(1)(a)-(c).

194.    The interception and use of Plaintiff's and Class Members' communications with Defendant was intentional and knowing as indicated by: (a) Defendant's choice to use the Tracking Tools on its Website; (b) Defendant's knowledge that utilizing the Tracking Tools on the Website would allow the Tracking Entities to link user activity and user identities, allowing the Tracking Entities to create invasive, encompassing targeting profiles of users and assemble those profiles into targetable audiences; and (c) Defendant's use of the Tracking Entities to intercept these communications resulted in Plaintiff's and Class Members' communications with Defendant to be duplicated and sent to the Tracking Entities in real time. Parts of the intercepted communications, in the form of Sensitive Information relating to the detailed URLs and products being clicked on and purchased, between Plaintiff, the Class Members, and the Website, constitute the "contents" of the communications for purposes of the Wiretap Act.

195.    Defendant did not receive consent from Plaintiff or the Class before using the Pixel to intercept and disclose their Sensitive Information to the Tracking Entities, and subsequently used their Sensitive Information for advertising purposes.

196.    As detailed above, Defendant's unauthorized interception, disclosure and use of Plaintiff's and the Class Members' Sensitive Information was only possible through its knowing, willful, or intentional placement of the Tracking Tools on the Website. 18 U.S. Code § 2511(1)(a).

197.    Defendant's use of the Tracking Tools to intercept Plaintiff's and Class Members' communications was done for purposes of committing criminal and tortious acts in violation of the laws of the United States, including intrusion upon seclusion, fraud, and the CLRA and UCL.

198.    Plaintiff and the Class have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such, Plaintiff and the Nationwide Class are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and the Nationwide Class and any profits made by Defendant as a result of the violation, or (b) statutory damages of

whichever is the greater of $100 per day per violation or $10,000; and (2) appropriate equitable or declaratory relief; (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

**SECOND CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff and the California Subclass)**

199.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

200.    Plaintiff brings this cause of action on behalf of herself and all Class Members.

201.    CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." CIPA extends civil liability for various means of surveillance using technology.

202.    CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

203.    The Ninth Circuit has confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). In dealing specifically with CIPA, the California Supreme Court has similarly concluded that the objective of CIPA is to protect a person's communications "from a situation where the other person on the other end of the line permits an

outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

204.    The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

205.    Within the relevant time period, Defendant, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and Class Members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

206.    The information collected by the Tracking Tools, including the TikTok Pixel, was not for the sole benefit of Defendant.

207.    Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to violate CIPA § 631.

208.    Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities, including the TikTok Pixel, to accomplish the wrongful conduct at issue here.

209.    Plaintiff and Class Members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

210.    The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

### THIRD CAUSE OF ACTION
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 638.51**
**(On Behalf of Plaintiff and the California Subclass)**

211.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

212.    Plaintiff brings this cause of action on behalf of herself and all Class Members.

213.    California's Pen Register and Trap-and-Trace Law is part of the California Invasion of Privacy Act ("CIPA") codified at Cal. Penal Code 630, *et seq.*

214.    A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." California Penal Code § 638.50(b).

215.    A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." California Penal Code § 638.50(c).

216.    "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

217.    California Penal Code § 638.51 provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order…" § 638.51(a). No court order to install pen register or trap-and-trace devices via the Tracking Tools was obtained by Defendant.

218.    Defendant uses pen register and trap-and-trace processes on its Website by deploying the Tracking Tools on its Website, because the Tracking Tools are designed to capture the phone number, email, routing, addressing, and other signaling information of website visitors. The Tracking Tools identify the source of the incoming electronic and wire communications to the Website.

219.    Defendant was not authorized by any court order to use pen register or trap-and-trace devices to track Plaintiff's and Class Members' activity on the Website.

220.    Defendant did not obtain consent from Plaintiff and Class Members before using pen register or trap-and-trace technology to identify users of its Website, and has violated Section 638.51.

221.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered losses and were damaged in an amount to be determined at trial.

222.    CIPA imposes civil liability and statutory penalties for violations of § 638.51.

223.    Therefore, Plaintiff and Class Members are entitled to the relief set forth below.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF COMMON LAW INVASION OF PRIVACY**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiff and the Nationwide Class)**

224.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

225.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

226.    Plaintiff and Class Members maintained a reasonable expectation of privacy in their communications with Defendant via its Website. Users' search terms, browsing history, geolocation data, and website activity have been recognized by society as sensitive information.

227.    Plaintiff and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive and confidential information; and (ii) being free to search for and purchase sensitive without observation, intrusion or interference, including, but not limited to, the right to visit and interact with internet websites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

228.    Plaintiff and Class Members possessed a reasonable expectation of privacy based on the belief that Defendant would abide by state criminal laws, such as CIPA. CIPA prohibits Tracking Entities from intercepting communications between users, such as Plaintiff and the Class, and other parties without the consent of all parties involved in the communication. Through its placement of Tracking Tools on the Website, Defendant enabled this interception and resulting intrusion upon Plaintiff's and Class Members' privacy.

As explained above, Defendant's actions constitute a serious invasion of privacy that was an egregious breach of social norms, such that the breach was highly offensive to a reasonable person because Defendant had no legitimate objective or motive in invading Plaintiff's and Class Members' privacy in such a manner;

Defendant violated multiple laws by invading Plaintiff's and Class Members' privacy, including the Wiretap Act and CIPA;

229.    Defendant deprived Plaintiff and Class Members of the ability to control the dissemination of their Sensitive Information.

230.    During the relevant time period, Defendant intentionally invaded the privacy rights of Plaintiff and Class Members by implementing Tracking Tools on its Website and actively enabling the Tracking Entities to collect and intercept their sensitive and confidential information.

231.    As a direct and proximate result of this infringement upon their privacy, Plaintiff and Class Members sustained harm and experienced various damages. In light of this injury, Plaintiff and Class Members are pursuing suitable remedies, such as compensatory damages, restitution, disgorgement, punitive damages, and any other relief that the Court deems appropriate and fair.

**FIFTH CAUSE OF ACTION**
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL")**
**(On Behalf of Plaintiff and the California Subclass)**

232.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

233.    The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

234.    By actively and affirmatively misleading consumers by omitting to inform them of the tracking pixels on the Website in violation of the CLRA, Defendant has violated the unlawful prong of the UCL.

235.    By actively and purposefully installing a wiretap without a visitor's consent in violation of the Federal Wiretap Act and CIPA, Defendant has violated the unlawful prong of the UCL.

236.    By actively and purposefully installing a pen register and trap and trace device without a visitor's consent in violation of CIPA, Defendant has violated the unlawful prong of the UCL.

237.    Defendant failed to disclose the presence of the Tracking Tools on the Website. Defendant disclosed visitors' personal identifying information without knowledge or consent. Defendant disclosed visitors' information to Tracking Entities to build personal profiles without knowledge or consent. Defendant failed to disclose that they were wiretapping visitors'

communications with the Website. Through this conduct, Defendant violated the unfair prong of the UCL.

238. Plaintiff has standing to bring claims against Defendant under the UCL. Plaintiff's information was tracked and recorded without consent. Plaintiff's data was used to build personal profiles for advertising purposes without consent.

239. Plaintiff would have considered it important to the decision to visit Defendant's Website to know that her data was being tracked and recorded without their consent.

240. Because of Defendant's UCL violations described above, Plaintiff suffered injury by losing control of her personal data and having her personal information tracked and recorded without her consent.

241. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered losses and were damaged in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
**Violations Of the California Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1770, et seq. ("CLRA")**
**(On Behalf of Plaintiff and the California Subclass)**

242. Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this Complaint.

243. The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

244. Defendant is a person under the CLRA.

245. Plaintiff is a consumer of Defendant's services under the CLRA, as Plaintiff used Defendant's Website.

246. Defendant undertook deceptive acts or practices, in violation of the CLRA, by failing to disclose the presence of the tracking tools on the Website. Defendant violated section 1770(a) of the CLRA by '[m]isrepresenting the source, sponsorship, approval, or certification of goods or services.'

247.    By this failure to disclose, Defendant violated section 1770(a)(5) of the CLRA by '[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.'

248.    By this failure to disclose, Defendant violated section 1770(a)(14) of the CLRA by '[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.'

249.    Defendant's failure to disclose was material to Website visitors such as Plaintiff. Visitors could have chosen a different website that did not use Tracking Tools. Visitors could have chosen a website that disclosed the presence of Tracking Tools and allowed them to be disabled. Visitors could have chosen a website that requested consent before implementing Tracking Tools.

250.    As a direct and proximate result of Defendant's conduct, Plaintiff and California Class Members suffered losses and were damaged in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### Common Law Fraud, Deceit and/or Misrepresentation
### (On Behalf of Plaintiff and the Nationwide Class)

251.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

252.    Plaintiff brings this cause of action on behalf of herself and all Class Members.

253.    Defendant made affirmative representations to users through their cookie banner, cookie preferences interface, and related disclosures that users could opt out of the sale or sharing of personal information and could decline all non-essential cookies.

254.    Defendant represented that exercising those options would limit or prevent the deployment of non-essential Tracking Tools, including targeting and performance cookies, and would stop the transmission of users' browsing activity, interactions, and related data to the Tracking Entities.

255.    Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

256.    These representations were false and misleading. After users, including Plaintiff, exercised their opt-out choices and declined non-essential cookies, Defendant continued to deploy Tracking Tools and continued to transmit user data to third parties.

257.    Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices.

258.    Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on user preferences, and Defendant could have implemented such measures.

259.    Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

260.    Plaintiff and Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

261.    Plaintiff's reliance was reasonable because Defendant presented the cookie banner and cookie preferences interface as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

262.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data.

263.    Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' data despite representing that such practices would cease upon opt-out.

264.    Plaintiff and Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

**EIGHTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class)**

265.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

266.    Plaintiff brings this cause of action on behalf of herself and all Class Members.

267.    Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiff's and Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

268.    Defendant's retention of those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent is unjust.

269.    Plaintiff and Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiff and the Class. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiff and Class Members are entitled to the relief set forth below.

**PRAYER**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.    For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Classes and their counsel as Class Counsel;

b.    For an order declaring the Defendant's conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d.    Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website users;

e.    An award of statutory damages or penalties to the extent available;

f.    For damages in amounts to be determined by the Court and/or jury;

g.   For pre-judgment interest on all amounts awarded;

h.   For an order of restitution and all other forms of monetary relief;

i.   An award of all reasonable attorneys' fees and costs; and

j.   Such other and further relief as the Court deems necessary and appropriate.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury of all issues so triable.

Dated: December 23, 2025          **SROURIAN LAW FIRM, P.C.**

By: */s/ Daniel Srourian*
Daniel Srourian, Esq. (SBN 285678)
468 N. Camden Dr., Suite 200
Beverly Hills, CA 90210
Telephone: (213) 474-3800
Fax: (213) 471-4160
Email: daniel@slfla.com

Mark S. Reich*
Christopher DeVivo*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com

*Counsel for Plaintiff*

**pro hac vice* forthcoming

CLASS ACTION COMPLAINT